371 F.3d 543
 Frank BUONO; Allen Schwartz, Plaintiffs-Appellees,
v.
Gale NORTON, Secretary of the Interior, in her official capacity; Jonathan Jarvis, Regional Director, Pacific West Region of the Department of Interior, in his official capacity;* Mary Martin, Superintendent of the Mojave National Preserve, in her official capacity, Defendants-Appellants.
 No. 03-55032.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted August 6, 2003.
 Filed June 7, 2004.
 
 Thomas L. Sansonetti, Assistant Attorney General, Jeffrey Bossert Clark, Deputy Assistant Attorney General, David C. Shilton, Charles R. Shockey, and Kathryn E. Kovacs, U.S. Department of Justice, Environment & Natural Resources Division, Appellate Section, Washington, DC, and Larry Bradfish, U.S. Department of the Interior, Oakland, CA, for the defendants-appellants.
 Peter J. Eliasberg and Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, CA, for the plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California; Robert J. Timlin, District Judge, Presiding. D.C. No. CV-01-00216-RT.
 Before KOZINSKI and T.G. NELSON, Circuit Judges, and RESTANI, Judge.**
 KOZINSKI, Circuit Judge:
 
 
 1
 Plaintiffs claim that the presence of a Latin cross on federally-owned land in the Mojave National Preserve, which is managed by the National Park Service, violates the Establishment Clause. A Latin cross "has two arms, one horizontal and one vertical, at right angles to each other, with the horizontal arm being shorter than the vertical arm." Buono v. Norton, 212 F.Supp.2d 1202, 1205 (C.D.Cal.2002). The Latin cross "is the preeminent symbol of Christianity. It is exclusively a Christian symbol, and not a symbol of any other religion." Id.; see also Ellis v. City of La Mesa, 990 F.2d 1518, 1527 (9th Cir.1993). The cross at issue is constructed of four-inch-diameter metal pipe and painted white. It sits in an area of the Preserve known as Sunrise Rock, adjacent to Cima Road, a secondary road roughly eleven miles from the I-15 in San Bernardino County, California.
 
 
 2
 Plaintiffs sued the Secretary of the Interior, the Regional Director of the National Park Service and the Superintendent of the Preserve, seeking removal of the cross. The district court granted summary judgment for plaintiffs and enjoined defendants from allowing continued display of the cross. Defendants appeal. We review the grant of summary judgment de novo. Winterrowd v. Am. Gen. Annuity Ins. Co., 321 F.3d 933, 937 (9th Cir.2003).[1]
 
 
 3
 1. Since we heard oral argument, Congress passed the Department of Defense Appropriations Act of 2004 (DDAA), Pub. L. No. 108-87, 117 Stat. 1054 (2003). Section 8121 of the DDAA requires the Secretary of the Interior to transfer the land on which the cross sits to the local Veterans of Foreign Wars Post in exchange for a privately-owned five-acre parcel elsewhere in the Preserve. Section 8121(a) further provides that, "[n]otwithstanding the conveyance of the property ..., the Secretary [of the Interior] shall continue to carry out the responsibilities of the Secretary under section 8137" of the Department of Defense and Emergency Supplemental Appropriations Act of 2002, Pub. L. No. 107-117, 115 Stat. 2230 (2002), which had designated the cross a war memorial. Section 8137(c) in turn directs the Secretary to "use not more than $10,000 of funds available for the administration of the Mojave National Preserve to acquire a replica of the original memorial plaque and cross placed at the national World War I memorial ... and to install the plaque in a suitable location on the grounds of the memorial." Finally, the DDAA provides that if the "property is no longer being maintained as a war memorial," the property shall revert to the United States. § 8121(c).
 
 
 4
 Defendants urge that, "[g]iven the impending mootness of this case, the Court should avoid deciding the constitutional issues raised here." Supplemental Mem. of Appellants at 4 (emphasis added). We are not convinced. This case is not yet moot and may not be for a significant time, as defendants concede that the land transfer could take as long as two years to complete.[2]
 
 
 5
 Even if the transfer were already completed, defendants have not carried their burden of showing that "(1) subsequent events [have] made it absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Norman-Bloodsaw v. Lawrence Berkeley Lab., 135 F.3d 1260, 1274 (9th Cir.1998) (internal quotation marks and citations omitted; alterations in original). "`Mere voluntary cessation of allegedly illegal conduct does not moot a case.'" Id. (quoting United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)); see also City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 288-89, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). As discussed, section 8121(c) of the DDAA provides that the land may revert to the federal government. Further, not only is there nothing in section 8121 that prevents the land from being otherwise returned to the government, federal law contemplates just such a transfer. See 16 U.S.C. § 431("When such [national monuments] are situated upon a tract ... held in private ownership, the tract, or so much thereof as may be necessary for the proper care and management of the object, may be relinquished to the Government, and the Secretary of the Interior is authorized to accept the relinquishment of such tracts in behalf of the Government of the United States."); see also id. § 410aaa-56 (authorizing the Secretary to "acquire all lands and interest in lands within the boundary of the[Mojave] preserve by donation, purchase, or exchange").
 
 
 6
 Finally, we note that the presence of a religious symbol on once-public land that has been transferred into private hands may still violate the Establishment Clause. See Freedom from Religion Found., Inc. v. City of Marshfield, 203 F.3d 487, 496 (7th Cir.2000) (as amended on denial of rehearing and rehearing en banc). We express no view as to whether a transfer completed under section 8121 would pass constitutional muster, but leave this question for another day. See Separation of Church & State Comm. v. City of Eugene (SCSC), 93 F.3d 617, 620 n. 5 (9th Cir.1996) (per curiam).
 
 
 7
 2. Defendants claim that plaintiffs Frank Buono and Allen Schwartz lack standing. To have standing, a plaintiff "must have suffered an injury in fact" that is "fairly traceable" to the challenged conduct, and "it must be likely that the injury would be redressed by a favorable decision." Desert Outdoor Adver. v. City of Moreno Valley, 103 F.3d 814, 818 (9th Cir.1996); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The district court concluded that plaintiffs have standing; we review de novo. Porter v. Jones, 319 F.3d 483, 489(9th Cir.2003).
 
 
 8
 The district court found that Buono is a retired employee of the Park Service who previously served as Assistant Superintendent of the Preserve. He "now lives in Oregon" but "regularly visits the Preserve." Buono, 212 F.Supp.2d at 1207. He "visit[s] the Preserve two to four times a year on average." Id. At the time of summary judgment, "Buono ... intend[ed] to sell his home in Oregon, to relocate to Southern California or Arizona, and to make more frequent trips to the Preserve." Id. The district court further found that:
 
 
 9
 Buono is deeply offended by the cross display on public land in an area that is not open to others to put up whatever symbols they choose. A practicing Roman Catholic, Buono does not find a cross itself objectionable, but stated that the presence of the cross is objectionable to him as a religious symbol because it rests on federal land.
 
 
 10
 
 Id.
 
 
 
 11
 Defendants argue that Buono has not suffered injury-in-fact. They assert that the offense he experiences in seeing the cross is "ideological, not religious, in nature and, hence, is not cognizable under the Establishment Clause." Appellants' Opening Br. at 12. This distinction is meaningful, they suggest, because "[u]nconstitutional establishments of religion cause harm by sending `a message to nonadherents that they are outsiders, not full members of the political community.'" Id. (quoting Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 773, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring)). They add that Buono did not allege that the presence of the cross at Sunrise Rock made him feel like an outsider. Defendants rely on Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), as the source for the purported distinction between ideologically and religiously-based offense. But Valley Forge does not support this distinction; instead, it reminds the federal courts that only concrete, personalized injury — not an abstract, generalized grievance — suffices to confer standing.
 
 
 12
 At issue in Valley Forge was a transfer of federal property in Pennsylvania from the government to Valley Forge Christian College, for which the college made no payment. Id. at 467-68, 102 S.Ct. 752. Plaintiffs "reside[d] in Maryland and Virginia; their organizational headquarters [we]re located in Washington, D.C. They learned of the transfer through a news release." Id. at 487, 102 S.Ct. 752 (footnote omitted). The Court concluded that, under these facts, plaintiffs had not "alleged an injury of any kind, economic or otherwise, sufficient to confer standing." Id. at 486, 102 S.Ct. 752. Rather, theirs was merely a generalized grievance. See id. at 482-86, 102 S.Ct. 752.
 
 
 13
 Valley Forge nowhere suggests that plaintiffs lacked standing because their offense at the property transfer was grounded in ideological, rather than religious, beliefs. Rather, plaintiffs lacked standing because their sense of offense was unaccompanied by "any personal injury suffered ... as a consequence of the alleged constitutional error." Id. at 485, 102 S.Ct. 752. The problem was not the nature of "the psychological consequence" plaintiffs experienced in observing "conduct with which [they] disagree[d]," but the absence of any personal injury at all, economic or non-economic, accompanying it. Id. By relying on Valley Forge, defendants confuse inquiry into whether the requisite injury-in-fact accompanies offense, with inquiry into the psychological motives giving rise to such offense. The Valley Forge Court drew a distinction between abstract grievances and personal injuries, not ideological and religious beliefs.
 
 
 14
 The district court found that "Buono will tend to avoid Sunrise Rock on his visits to the Preserve as long as the cross remains standing, even though traveling down Cima Road is often the most convenient means of access to the Preserve." Buono, 212 F.Supp.2d at 1207. Buono is, in other words, unable to "freely us[e]" the area of the Preserve around the cross because of the government's allegedly unconstitutional actions. SCSC, 93 F.3d at 619 n. 2. We have repeatedly held that inability to unreservedly use public land suffices as injury-in-fact. See id. (noting that plaintiff organization "is composed of local citizens who have standing to bring this challenge because they alleged that the cross prevented them from freely using the area on and around" the location of the cross); see also Ellis, 990 F.2d at 1523; Hewitt v. Joyner, 940 F.2d 1561, 1564-65 (9th Cir.1991). Such inhibition constitutes "personal injury suffered ... as a consequence of the alleged constitutional error," beyond simply "the psychological consequence presumably produced by observation of conduct with which one disagrees." Valley Forge, 454 U.S. at 485, 102 S.Ct. 752. Moreover, we have so held even as to plaintiffs who, like Buono, are members of religious sects but nonetheless are offended by religious displays on government property. See Ellis, 990 F.2d at 1523(plaintiffs with standing included members of Catholic and Episcopalian faiths). Buono has therefore alleged injury-in-fact sufficient to confer standing.[3]
 
 
 15
 3. Defendants argue on the merits that display of the cross at Sunrise Rock does not violate the Establishment Clause. The district court concluded that "the primary effect of the presence of the cross" was to "advance[] religion." Buono, 212 F.Supp.2d at 1215. We review de novo whether the Establishment Clause was violated. Int'l Ass'n of Machinists, Lodge 751 v. Boeing Co., 833 F.2d 165, 167 (9th Cir.1987).
 
 
 16
 This case is squarely controlled by Separation of Church & State Committee v. City of Eugene. In SCSC, plaintiffs alleged that a "fifty-one foot concrete Latin cross with neon inset tubing," located at the crest of a hill in a city park, violated the Establishment Clause. 93 F.3d at 618. "From the late 1930s to 1964, private individuals [had] erected a succession of wooden crosses in the park, one replacing another as they deteriorated. In 1964, private individuals erected the cross at issue" in SCSC. Id. In 1970, the cross was designated as a war memorial and deeded to the City of Eugene; "a bronze plaque was placed at the foot of the cross dedicating it as a memorial to [all] war veterans." Id. at 618-19. Beginning that year, the City of Eugene "illuminated the cross" during the Christmas and Thanksgiving seasons, as well as "on Memorial Day, Independence Day, and Veteran's Day." Id. at 618. Considering both the effects prong of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and the endorsement test from Justice O'Connor's concurrence in Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), we held that "[t]here is no question that the Latin cross is a symbol of Christianity, and that its placement on public land by the City of Eugene violates the Establishment Clause[, b]ecause the cross may reasonably be perceived as governmental endorsement of Christianity." SCSC, 93 F.3d at 620.
 
 
 17
 Similarly here, the cross at Sunrise Rock sits on publicly-owned land, and both it and its predecessors were privately erected. A cross was first placed on the site in 1934 by the Veterans of Foreign Wars, in memory of veterans who died during World War I; a plaque near the original cross identified it as a war memorial. Private parties have since replaced the original cross several times. Easter Sunrise services have been held at Sunrise Rock since at least 1935. The Park Service has not opened the cross site to other permanent displays, nor are there other displays, religious or otherwise, in the area. In 1999, the Park Service denied a third-party request to erect a Buddhist stupa near the cross.[4] Although there is currently no plaque or sign indicating as much,[5] recent legislation designated the Sunrise Rock cross as a federal war memorial for World War I veterans. See Department of Defense and Emergency Supplemental Appropriations Act § 8137. Federal law prohibits the Park Service from spending money to remove the cross. See Department of Defense Appropriations Act of 2003, Pub. L. No. 107-248, § 8065(b), 116 Stat. 1519 (2002) (prohibiting the use of funds to dismantle World War I memorials); Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, § 133, 114 Stat. 2763 (2000) (same as to removal of Sunrise Rock cross).
 
 
 18
 Defendants seek to distinguish SCSC by contrasting the visibility and location of the two crosses. They point out that the SCSC cross was fifty-one feet tall, illuminated with neon tubing and located in a city park adjacent to Eugene's downtown business district. By contrast, the Sunrise Rock cross is five to eight feet tall, "is in a remote location, is not projected toward the public, and is not illuminated the way the cross was in SCSC." Appellants' Opening Br. at 22. Further, they continue, the "cross at issue here is not in an urban park or adjacent to a public building[,]... [which are] tangible embodiments of government." Id.
 
 
 19
 These distinctions are of no moment. Though not illuminated, the cross here is bolted to a rock outcropping rising fifteen to twenty feet above grade and is visible to vehicles on the adjacent road from a hundred yards away. Even if the shorter height of the Sunrise Rock cross means that it is visible to fewer people than was the SCSC cross, this makes it no less likely that the Sunrise Rock cross will project a message of government endorsement to a reasonable observer. See SCSC, 93 F.3d at 625 n. 11 (O'Scannlain, J., concurring) ("[T]he Establishment Clause focuses on whether the religious display creates an appearance of governmental endorsement of religion. Thus, how few or how many people view the display does not advance the analysis.").
 
 
 20
 Nor does the remote location of Sunrise Rock make a difference. That the Sunrise Rock cross is not near a government building is insignificant — neither was the SCSC cross. What is significant is that the Sunrise Rock cross, like the SCSC cross, sits on public park land. National parklands and preserves embody the notion of government ownership as much as urban parkland, and the remote location of Sunrise Rock does nothing to detract from that notion.
 
 
 21
 Defendants further argue that a reasonable observer would not perceive the cross site as public land because of the proximity of two private ranches and several corrals within two miles of the cross. How much information we will impute to a reasonable observer is unclear. Justice O'Connor has suggested that a reasonable observer "must be deemed aware of the history and context of the community and forum in which the religious display appears," including ownership of the land in question. Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780-81, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring). Under this view, a reasonable observer would know that Sunrise Rock is federally-owned. Even if we assumed a reasonable observer to be less well-informed, see id. at 800 n. 5, 115 S.Ct. 2440 (Stevens, J., dissenting), we would still reach the same conclusion. The Mojave National Preserve encompasses 1.6 million acres, over 90 percent of which is federally-owned, and the area where the cross sits is used as a campground. Given the ratio of publicly-owned to privately-owned land in the Preserve and the use to which the Sunrise Rock area is put, a less well-informed reasonable observer would still believe — or at least suspect — that the cross rests on public land.
 
 
 22
 Finally, defendants suggest that a reasonable observer aware of the history of the cross — such as its placement by private individuals — would believe that the government is not endorsing Christianity by allowing the cross to remain at the site. However, a reasonable observer who is that well-informed would know the full history of the cross: that Congress has designated the cross as a war memorial and prohibited the use of funds to remove it, and that the Park Service has denied similar access for expression by an adherent of the 7378 Buddhist faith. " `Whatever else the Establishment Clause may mean..., it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions).'" SCSC, 93 F.3d at 619 (citation omitted) (quoting Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 605, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)).
 
 
 23
 This case is materially indistinguishable from SCSC. Thus, even assuming that the government has a clearly secular purpose in maintaining display of the cross as a war memorial, see Lemon, 403 U.S. at 612, 91 S.Ct. 2105, the Sunrise Rock cross violates the Establishment Clause.
 
 
 24
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Jarvis is substituted for his predecessor, John J. Reynolds, former Regional Director of the Pacific West Region of the Department of the Interior. See Fed. R.App. P. 43(c)(2)
 
 
 **
 The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 We stayed the district court's order permanently enjoining display of the cross to the extent that the order required the immediate removal or dismantling of the cross. We did not stay alternative methods of compliance with, or additional obligations imposed by, the district court's orderBuono v. Norton, No. 03-55032, 2003 WL 22724262 (9th Cir. May 15, 2003) (order granting motion to stay); Buono v. Norton, No. 03-55032, 2003 WL 22724265 (9th Cir. June 6, 2003) (clarifying May 19 order). The Department of the Interior has covered the cross.
 
 
 [2]
 So far, the Bureau of Land Management has completed a survey and legal description of the cross site as the first step toward the land transfer
 
 
 [3]
 Plaintiff Schwartz, a Jewish veteran, never visited the Preserve or saw the cross until he decided to join this case as a plaintiff. The district court found that Schwartz "is not offended or injured by the sight of the cross, only by the fact that the land on which it rests is federally owned."Buono, 212 F.Supp.2d at 1208. Schwartz asserts that he "intends to visit the cross area regularly during his trips to Las Vegas because he finds the presence of the cross on government land offensive. He will go to see if it has been taken down." Id. at 1209. Defendants contend that Schwartz lacks standing because, like Buono, he does not allege sufficient injury and because he subjected himself to his alleged harm by seeking out the cross.
 Because we hold that Buono has standing, we need not also evaluate Schwartz's standing. See Leonard v. Clark, 12 F.3d 885, 888 (9th Cir.1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." (citing Carey v. Population Servs. Int'l, 431 U.S. 678, 682, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977))).
 
 
 [4]
 A stupa is a "hemispherical or cylindrical mound or tower, artificially constructed of earth, brick, or stone, containing a relic chamber and surmounted by a spire or umbrella; esp., a Buddhist mound forming a memorial shrine of the Buddha." Webster's New International Dictionary 2504 (2d ed. 1939)
 
 
 [5]
 Defendants assert that the cross "will soon have a new sign [identifying it as a war memorial] ... that will correct any misperceptions about the purpose and message of the cross." Appellants' Opening Br. at 23. Defendants are mistaken that the presence of such a sign would enhance their position. InSCSC, the City of Eugene placed a plaque on the cross in question, identifying it as a war memorial. However, despite the sign — indeed, perhaps because of it — "observers might[still have] reasonably perceive[d] the City's display of such a religious symbol on public property as government endorsement of the Christian faith. Further, the City's use of a cross to memorialize the war dead m[ight have led] observers to believe that the City ha[d] chosen to honor only Christian veterans." SCSC, 93 F.3d at 626 (O'Scannlain, J., concurring).