**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

AMERICAN HUMANIST
ASSOCIATION, INC.; JOHN DOE,
individually, and as parent and next friend
of Doe Child-1 and Doe Child-2; DOE
CHILD-1, a minor; DOE CHILD-2, a
minor; JACK ROE, individually and as a
parent on behalf of a minor; JANE ZOE,
individually and as a parent on behalf of a
minor,

      Plaintiffs - Appellants,

and

JILL ROE, individually and as a parent on
behalf of a minor,

      Plaintiff,

v.

DOUGLAS COUNTY SCHOOL
DISTRICT RE-1; DOUGLAS COUNTY
BOARD OF EDUCATION; ELIZABETH
CELANIA-FAGEN, in her official
capacity as Superintendent of Douglas
County School District; JOHN
GUTIERREZ, in his official capacity as
Principal of Cougar Run Elementary
School; JERRY GOINGS, in his official
capacity as Principal of Highlands Ranch
High School,

      Defendants - Appellees,

and

No. 16-1049

MICHAEL MUNIER, in his individual capacity; WENDY KOCESKI, in her official capacity as Elementary Principal of SkyView Academy; LISA NOLAN, in her official capacity as Executive Director of SkyView Academy,

Defendants.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:14-CV-02878-RBJ)**

_____

David A. Niose (Monica L. Miller, with him on the briefs), American Humanist Association, Washington, D.C., for Plaintiffs-Appellants.

Eric V. Hall (Stacy Kourlis Guillon, with him on the brief), Lewis Roca Rothgerber Christie, LLP, Denver, Colorado, for Defendants-Appellees.

_____

Before **LUCERO**, **HARTZ**, and **McHUGH**, Circuit Judges.

_____

**LUCERO**, Circuit Judge.

_____

Plaintiffs, families with children enrolled in the Douglas County School District RE-1 ("DCSD") and the American Humanist Association ("AHA"), filed this action challenging various DCSD practices as violations of the Establishment Clause and the Equal Access Act ("EAA"). They contend that DCSD has engaged in a pattern and practice of promoting Christian fundraising efforts and permitting faculty participation in Christian student groups. Although we have no doubt that plaintiffs are genuinely and fervently committed to righting what they view as an injustice, "a

2

generalized grievance, no matter how sincere, is insufficient to confer standing."

Hollingsworth v. Perry, 133 S. Ct. 2652, 2662 (2013) (quotation omitted). Most of

the plaintiffs have failed to demonstrate that they or their children experienced

"personal and unwelcome contact with government-sponsored religious" activities.

Awad v. Ziriax, 670 F.3d 1111, 1122 (10th Cir. 2012) (quotation omitted). Further,

they have not made out a case for municipal taxpayer standing because they have not

shown an expenditure of municipal funds on the challenged activities.

The sole exception is plaintiff Jane Zoe. She contends that DCSD violated the

Establishment Clause when school officials announced they were "partnering" with a

Christian student group and solicited her and her son for donations to a "mission

trip." The district court held that because Zoe's contacts with the challenged actions

were not conspicuous or constant, she did not suffer an injury for standing purposes.

We find no support in our jurisprudence for the proposition that an injury must meet

some threshold of pervasiveness to satisfy Article III. As the Supreme Court has

explained, "an identifiable trifle is enough for standing to fight out a question of

principle." United States v. Students Challenging Regulatory Agency Procedures

(SCRAP), 412 U.S. 669, 689 n.14 (1973) (quotation omitted). We conclude that Zoe

possesses standing to seek retrospective relief. Exercising jurisdiction under 28

U.S.C. § 1291, we affirm in part and reverse in part.

**I**

3

Plaintiffs' complaint identifies several different schools and groups of school officials.  We describe the facts as they relate to each family of plaintiffs.

**A**

Zoe's two children attend Cougar Run Elementary.  In 2014, Zoe and her son were asked to participate in a fundraising event for a spring break mission trip to Guatemala organized by a student at Highlands Ranch High School ("HRHS"), Amanda Berry.  Berry planned the trip through an organization called Adventures in Missions ("AIM").  AIM is a Christian group that arranges evangelical mission trips to various destinations.  Berry discussed the trip at a meeting of the HRHS Fellowship of Christian Athletes ("FCA"), a non-curricular club at the school.  After other students expressed interest in participating, Berry arranged for several fundraisers through the FCA to help students pay trip expenses.

Two HRHS teachers, Alex Malach and Bradley Odice, agreed to chaperone the trip.  They both participated in fundraising activities.  Donors were directed to make checks payable to HRHS, and those funds were deposited into a student-activity account held by the school.  Malach created flyers for some of the fundraising events, which provided her school email account as the contact for any questions.  Odice also sent an email containing a flyer to a Cougar Run employee and encouraged her to share it with staff.

In February 2014, Micki Benge, a teacher at Cougar Run, emailed Odice and Malach about organizing a supply drive for the Guatemala trip.  Malach responded that she was "in charge" of "the trip to Guatemala as a whole" and would be happy to

4

involve Cougar Run students. On March 6, Benge sent an email to the Cougar Run staff stating that a supply drive for the Guatemala trip would occur the following week. The email states: "We are partnering with HRHS on this effort – specifically the FCA (Fellowship of Christian Athletes) organization." In a follow-up email about the supply drive, Benge told teachers "we appreciate any positive talk you can give it in your classrooms."

On March 10, Zoe received an email from her son's teacher, Cammile Espinosa, forwarding Benge's March 6 message requesting supply donations for the Guatemala trip in partnership with FCA. At the beginning of the forwarded message, Espinosa wrote: "Parents, A great opportunity to pay it forward! Thank you in advance for your support!" Zoe's son was also sent home with a flyer describing the supply drive. The flyer indicates that the supply drive is "Sponsored by Cougar Run 6th Graders partnering with the FCA (Fellowship of Christian Athletes)," that "FCA students will take [donated supplies] with them to run camps during their Spring Break mission to San Pedro," and that monetary donations can be provided with "checks payable to Cougar Run Elementary."

After her son showed her the flyer, Zoe told him that they would not be supporting the fundraiser. Zoe avers that her son "felt coerced into participating and contributing to this religious fundraiser" and that school officials "expected participation." She states that "[a]s non-Christians, the school's actions in promoting and endorsing a Christian organization . . . made us feel like outsiders and unwelcome in our own community."

5

FCA members from HRHS later visited Cougar Run to pick up the supplies donated by students. The group visited Guatemala in March 2014. They engaged in various proselytizing activities during the trip, some of which were aided by the supplies raised at Cougar Run.

Zoe intends to send her children to Cresthill Middle School and HRHS. She learned during this litigation that a teacher at HRHS worked with a teacher at Cresthill to introduce FCA at Cresthill. At HRHS, faculty advisors initiated prayers with students at FCA meetings and led various club activities. Several teachers attended FCA meetings not as supervisors, but simply to be part of the group. Zoe also identifies as problematic an annual prayer event called "See You at the Pole," which takes place before school hours at HRHS. Numerous faculty members take part in this event, and HRHS teachers have used their school email addresses to invite Christian pastors to the gathering.

**B**

Jack and Jill Roe have a son at Douglas County High School ("DCHS") and a daughter they intend to send to DCHS as a freshman for the 2017-18 school year. In December 2014, when the Roes' son was a junior at DCHS, two DCHS teachers promoted participation in Operation Christmas Child ("OCC") during their Freshman Transition classes. OCC is a program run by an evangelical Christian organization, Samaritan's Purse, which collects boxes to send to impoverished children in third world countries during the Christmas season. Christian reading materials are also

inserted in the boxes at processing facilities. The Roes' son did not personally encounter any OCC-related activities.

During this litigation, the Roes learned that the FCA advisor at DCHS, Lon Smith, had a particularly active role in FCA, which suggested a greater involvement in the group than mere faculty supervisor. Smith directed student questions about FCA to himself in morning announcements and frequently referred to the club using the first person plural. The Roes also discovered that DCHS teachers distributed information regarding an FCA football camp using school email addresses. The Roes state that these activities are troubling to them, and they are reconsidering whether to send their daughter to DCHS.

## C

John Doe is the parent of two children at a charter school in DCSD. Both children are also plaintiffs in this litigation. Doe originally brought claims against officials at his children's school, but voluntarily dismissed one official and settled his remaining claims as to the charter school. Doe's remaining claims against DCSD are based solely on his assertion of municipal taxpayer standing.

All adult plaintiffs assert municipal taxpayer standing based on the activities at their children's respective schools as well as a number of actions at other DCSD schools. They note that in 2012, Rockridge Elementary included in its spirit week fundraising activities an event related to the Tim Tebow Foundation, a Christian charity. They also point to OCC activities and faculty participation in FCA clubs at a

7

number of schools throughout the district. And plaintiffs contend that DCSD leaders tolerate what they view as endorsement of religion.

D

Plaintiffs filed suit in October 2014, bringing claims both individually and as next friends of their children. They allege that defendants violated the First Amendment by endorsing Christianity, and violated the EAA, 20 U.S.C. § 4071(c), by permitting faculty to participate in Christian student groups. They sought nominal damages; a declaratory judgment that defendants' actions violated the Establishment Clause and the EAA; and a permanent injunction prohibiting defendants from affiliating with any religious organization, using school resources or the school email system to promote religious groups, or allowing district employees to pray and proselytize while supervising student groups.

On cross motions for summary judgment, the district court concluded that plaintiffs lacked standing. It held that Zoe did not have standing because her son's exposure to allegedly unconstitutional activities at Cougar Run lacked "a degree of constancy or conspicuousness" present in similar cases. The court concluded that the Roes did not possess standing because their son was not personally exposed to the events described above at DCHS, and that any potential injury to their daughter was not certainly impending. It further held that none of the plaintiffs fit within the zone of interest protected by the EAA, and it rejected all plaintiffs' claims of municipal taxpayer standing. Finally, because none of the individual plaintiffs possessed

8

standing, the court held that AHA lacked associational standing. Plaintiffs filed a timely notice of appeal.[1]

## II

We review de novo a district court's dismissal for lack of standing. Merida Delgado v. Gonzales, 428 F.3d 916, 919 (10th Cir. 2005). To establish Article III standing, a plaintiff must show: (1) that he has "suffered an injury in fact"; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that it is "likely" that "the injury will be redressed by a favorable decision." Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 133-34 (2011) (quotations and alterations omitted).

"Each plaintiff must have standing to seek each form of relief in each claim." Bronson v. Swensen, 500 F.3d 1099, 1106 (10th Cir. 2007). A plaintiff who has suffered a concrete and particularized injury possesses standing to seek retrospective relief. Tandy v. City of Wichita, 380 F.3d 1277, 1284 (10th Cir. 2004). "To seek prospective relief, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." Id. at 1283. Past injuries are relevant to showing a risk of future harm, but "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (quotation and alterations omitted).

_____

[1] Jill Roe did not appeal.

We have previously noted that "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases." Awad, 670 F.3d at 1120 (quotation omitted). In Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464 (1982), the Supreme Court held that plaintiffs lacked standing to challenge a transfer of surplus federal property to a religious college because they failed to "identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." Id. at 485 (emphasis omitted). However, the Court made clear that it was not rejecting its "earlier holdings that standing may be predicated on noneconomic injury." Id. at 486. It reaffirmed the standing of schoolchildren and parents "who are directly affected by the laws and practices against which their complaints are directed." Id. at 486 n.22 (quoting Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 224 n.9 (1963)). Such plaintiffs possess standing "because impressionable schoolchildren [are] subjected to unwelcome religious exercises or [are] forced to assume special burdens to avoid them." Id.

"Since Valley Forge, the Supreme Court has not provided clear and explicit guidance on the difference between psychological consequence from disagreement with government conduct and noneconomic injury that is sufficient to confer standing." Awad, 670 F.3d at 1121 (footnote omitted). However, our case law is clear that "alleging only personal and unwelcome contact with government-sponsored religious symbols is sufficient to establish standing." Id. at 1122 (quotation omitted);

10

see also O'Connor v. Washburn Univ., 416 F.3d 1216, 1223 (10th Cir. 2005) ("Allegations of personal contact with a state-sponsored image suffice to demonstrate this kind of direct injury.").

We have accordingly held that plaintiffs possess standing in a variety of Establishment Clause cases, including college students who observed an allegedly anti-Catholic statue on campus, O'Connor, 416 F.3d at 1219, 1223, citizens who drove by roadside crosses commemorating fallen highway patrol troopers, Am. Atheists, Inc. v. Davenport, 637 F.3d 1095, 1113 (10th Cir. 2010), individuals exposed to crosses as a city's symbol, Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1028-29 (10th Cir. 2008), a plaintiff who observed a city seal depicting a temple, Foremaster v. City of St. George, 882 F.2d 1485, 1490-91 (10th Cir. 1989), and parents challenging teacher-led religious meetings that occurred in their children's classrooms prior to the start of the school day, Bell v. Little Axe Indep. Sch. Dist. No. 70, 766 F.2d 1391, 1398 (10th Cir. 1985), disapproved on other grounds by Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299 (1986). Although plaintiffs in some of these cases altered their routines in response to the challenged state action, we have expressly held that a plaintiff need not change his behavior to establish standing. Foremaster, 882 F.2d at 1491 (plaintiff had standing based on "direct personal contact with offensive municipal conduct" even though "he did not contend he changed his behavior").

11

## A

The district court concluded that Zoe lacks standing because she "only received one flyer and one email" about the Guatemala mission trip, and thus her claimed injury lacked the "degree of constancy or conspicuousness" present in our other Establishment Clause cases, citing Weinbaum and Foremaster. Both of those cases featured "constant" or "pervasive" exposure to religious symbols. See Weinbaum, 541 F.3d at 1028; Foremaster, 882 F.2d at 1491.

However, nothing in our case law suggests that a single alleged injury is insufficient to confer standing. The Supreme Court has squarely rejected the argument that one lacks standing unless she is "significantly" injured. SCRAP, 412 U.S. at 689 n.14. Instead, anyone with "a direct stake in the outcome of a litigation—even though small" has standing. Id. Noting that it had adjudicated important cases in which plaintiffs had "no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax," the Court concluded that "an identifiable trifle is enough for standing to fight out a question of principle." Id. (citations and quotation omitted).

Similarly, our court has held that a party possesses standing to appeal a nominal damages award of one dollar. Sprint Nextel Corp. v. Middle Man, Inc., 822 F.3d 524, 527-28 (10th Cir. 2016). We have also concluded plaintiffs had standing to challenge a one-time delay in a permit application that did not result in any compensatory damages. Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1256 (10th Cir. 2004). Other circuits have been more explicit in holding that

12

"[t]here is no minimum quantitative limit required to show injury." Saladin v. City of Milledgeville, 812 F.2d 687, 691 (11th Cir. 1987); see also Cramer v. Skinner, 931 F.2d 1020, 1027 (5th Cir. 1991) ("The Constitution draws no distinction between injuries that are large, and those that are comparatively small."); Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931, 937 (D.C. Cir. 1986) (injury "will not suffice if it is too speculative, but it need not be large or intense" (citation omitted)).

Given this authority, were we to affirm the judgment below, we would have to impose a quantitative threshold as a special requirement for Establishment Clause standing. Yet we have no basis to conclude Establishment Clause plaintiffs should be subject to a heightened burden, and good reason to think otherwise. In Lee v. Weisman, 505 U.S. 577 (1992), the Supreme Court held that a father presented a "live and justiciable controversy" after his child was exposed to approximately two minutes of prayer at a middle school graduation and a similar prayer was likely to occur at the child's high school graduation. Id. at 583-84. It explained that the "injury caused by the government's action" was "that the State, in a school setting, in effect required participation in a religious exercise." Id. at 594. Although it was a "brief exercise," the court rejected any suggestion that this injury could be characterized as de minimis:

> [T]he intrusion is greater than the two minutes or so of time consumed for prayers like these. Assuming, as we must, that the prayers were offensive to the student and the parent who now object, the intrusion was both real and, in the context of a secondary school, a violation of the objectors' rights.

Id.

13

Addressing a nearly identical question to that presented here, the Third Circuit held that a district court was "incorrect" to "read the direct, unwelcome contact standard to include a frequency requirement" in an Establishment Clause case. Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist., 832 F.3d 469, 477 (3d Cir. 2016). Imposing a quantitative contact requirement, the court explained, would be "inconsistent with the concept that a single 'trifle' is sufficient to establish standing." Id. (quoting SCRAP, 412 U.S. at 689 n.14). And although courts have on occasion referenced the frequency of unwelcome contact, they have not done so in the context of stating the requirements for standing. Id. at 477-78 (collecting cases). Accordingly, the court held that a citizen "may establish standing by showing direct, unwelcome contact with the allegedly offending object or event, regardless of whether such contact is infrequent." Id. at 479.

DCSD cites two cases for the contrary proposition, but neither suggests that some undefined number of unwelcome religious contacts is required to establish standing. In Freedom from Religion Foundation, Inc. v. Obama, 641 F.3d 803 (7th Cir. 2011), the Seventh Circuit concluded that plaintiffs lacked standing to challenge a statute requiring an annual presidential proclamation designating a national day of prayer. Id. at 805. The opinion does not discuss the frequency of the plaintiffs' exposure to unwelcome religious messages. It distinguished cases in which plaintiffs were exposed to religious displays based on Seventh Circuit case law holding that such plaintiffs have standing only if they alter their routines in some way to avoid religious imagery. Id. at 807-08 (citing Freedom from Religion Found., Inc. v.

14

Zielke, 845 F.2d 1463 (7th Cir. 1988)). Our circuit has rejected this requirement. Foremaster, 882 F.2d at 1491. DCSD also cites Caldwell v. Caldwell, 545 F.3d 1126 (9th Cir. 2008). There, the court held a plaintiff lacked standing to challenge a website created by the University of California Museum of Paleontology that discussed evolution. Id. at 1128. Again, the opinion makes no mention of the frequency of the plaintiff's contact with the site; the court held that she lacked standing because "there is too slight a connection between [plaintiff's] generalized grievance, and the government conduct about which she complains." Id. at 1133. The Caldwell court specifically distinguished cases in which plaintiffs were "parents whose children are directly exposed to unwelcome religious exercises in the classroom and the school district." Id.

In light of the foregoing authorities, we conclude that the district court erred in holding that a plaintiff must suffer pervasive exposure to establish standing. Applying the general rule that "an identifiable trifle is enough for standing to fight out a question of principle," SCRAP, 412 U.S. at 689 n.14 (quotation omitted), and our circuit precedent that "personal and unwelcome contact with government-sponsored religious symbols is sufficient to establish standing," Awad, 670 F.3d at 1122 (quotation omitted), we hold that even infrequent contact suffices.

The record demonstrates that Zoe was directly and personally solicited by school officials to donate to a "mission" trip, and she was informed that a class at her son's school was "partnering with" a religious group, the "Fellowship of Christian Athletes," to conduct the fundraiser. The solicitation further advised that checks for

15

the event should be written to the school. Zoe avers that she took the solicitation to mean that school officials "expected participation," and that it made her family "feel like outsiders and unwelcome in our own community."[2] These unwelcome contacts are sufficient to establish injury with respect to Zoe's claim to retrospective relief.[3]

The district court also stated that Zoe's injury was not fairly traceable to the challenged conduct. In so ruling, the court misidentified the relevant injury. It stated that later maltreatment of Zoe's son by other children was unrelated to the fundraising solicitations. But these are not the injuries upon which Zoe rests her constitutional claim. She relies on the unwelcome contact itself, which we have concluded is sufficient. In Bell, we reversed under almost identical circumstances.

---

[2] In addition to their argument regarding the infrequency of contact, DCSD appears to argue that the solicitation to participate in the fundraiser does not constitute endorsement of any religion. But, as to standing, "the question is not whether the alleged injury rises to the level of a constitutional violation. That is the issue on the merits." Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc). "For purposes of standing, we must assume the Plaintiffs' claim has legal validity." Id. at 1093. We decline to rule on the merits of Zoe's claim and do not express any view on that score.

[3] The complaint seeks retrospective declaratory relief and nominal damages. As the Supreme Court has instructed, nominal damages "are the appropriate means of vindicating rights whose deprivation has not caused actual, provable injury." Memphis Cmty. Sch. Dist., 477 U.S. at 308 n.11 (quotation omitted). And although "[i]t may seem odd that a complaint for nominal damages could satisfy Article III's case or controversy requirements, . . . this Court has squarely so held." Utah Animal Rights Coal., 371 F.3d at 1257 (footnote omitted). In Faustin v. City & County of Denver, 268 F.3d 942 (10th Cir. 2001), we ruled that a plaintiff lacked standing to enjoin a statute because she did not show a real and immediate threat that she would be prosecuted under it in the future, but we concluded she had standing to seek nominal damages and declaratory relief as to her past prosecution. Id. at 946, 948; see also Comm. for the First Amendment v. Campbell, 962 F.2d 1517, 1526-27 (10th Cir. 1992) (remanding for consideration of nominal damages following dismissal of claims for prospective relief as moot).

16

There, the district court held that a school's religious policy was not "the proximate cause of any injuries inflicted by others." 766 F.2d at 1408. We concluded that the district court "viewed the issue too narrowly," and noted that a "distinction must be made between the injuries caused by others and those inflicted by the actions of defendants that violated the Establishment Clause." Id. The injury at issue in this case is thus fairly traceable to the challenged action of DCSD employees. Ariz. Christian Sch. Tuition Org., 563 U.S. at 134. We also conclude that the injury is redressable. See Tandy, 380 F.3d at 1290 ("It is likely, and not merely speculative, that compensatory or nominal damages can redress [plaintiff's] injury in fact.").[4]

We reach the opposite conclusion, however, as to Zoe's claim to prospective relief. Although she has stated a past injury, the record does not suggest that Zoe is likely to receive similar fundraising solicitations in the future. See Lyons, 461 U.S. at 102 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." (quotation and alterations omitted)). The mission trip to Guatemala was a one-time event initiated by a student at another school. Cougar Run's principal

---

[4] The district court concluded that AHA lacks associational standing because none of its individual members have standing. Because we have concluded that Zoe possesses standing to pursue retrospective relief, we reverse that ruling. We leave it to the district court on remand to consider the remaining associational standing factors. See Colo. Taxpayers Union, Inc. v. Romer, 963 F.2d 1394, 1397-98 (10th Cir. 1992). And as the Supreme Court recently reminded us, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester v. Laroe Estates, Inc., S. Ct. No. 16-605 (June 5, 2017), slip op. at 5 (quotation omitted). We also leave to the district court in the first instance to determine the scope of the claim for which Zoe has standing.

17

was unaware of the religious aspect of the trip and testified that he would not have allowed such a fundraiser had he been aware. Although it is possible that Zoe might be subject to a similar injury, we cannot say such an injury is "certainly impending." Tandy, 380 F.3d at 1283 (quotation omitted).

Zoe also identified practices at Cresthill Middle School and HRHS, where she intends to send her children in the future. She notes that an HRHS teacher and a faculty member at Cresthill worked together to introduce FCA at Cresthill, that HRHS faculty advisors participate in FCA events, and that several HRHS teachers are involved in an annual prayer event at HRHS. But these contentions fail to demonstrate that Zoe's children will likely face "personal and unwelcome contact with government-sponsored religious symbols . . . sufficient to establish standing." Awad, 670 F.3d at 1122 (quotation omitted). Some children at Cresthill or HRHS may be subject to unwelcome personal contact with religious symbols, but such contact is not "certainly impending" as to Zoe's children. Tandy, 380 F.3d at 1283 (quotation omitted); see also Roberts v. Madigan, 921 F.2d 1047, 1052 (10th Cir. 1990) (concluding plaintiffs lacked standing to seek injunctive relief because there was no more than a "speculative likelihood" that their children would matriculate into the specific classroom in which alleged Establishment Clause violations occurred).

Finally, Zoe and the other plaintiffs argue that they are currently injured by a district policy permitting Christian fundraising activities throughout DCSD, relying on Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000). In that case,

18

the Court rejected an argument that plaintiffs had "made a premature facial challenge" to a revised school policy regarding prayer at high school football games. Id. at 313. Because "the text of the [revised] policy alone reveals that it has an unconstitutional purpose" and the context of the revised policy confirmed a purpose of endorsing school prayer, the Court held it "need not wait for the inevitable [prayer] to confirm and magnify the constitutional injury." Id. at 314, 316.

Although the Santa Fe decision does not discuss standing at all, plaintiffs point to the Court's statement that the Establishment Clause guards against "constitutional injuries," including "mere passage by the District of a policy that has the purpose and perception of government establishment of religion." Id. at 314. But we do not read this statement as sub silentio overruling our direct and unwelcome contact standard. See Gad v. Kan. State Univ., 787 F.3d 1032, 1040 (10th Cir. 2015) (explaining that so-called "drive-by jurisdictional rulings," in which a court decides a question without directly addressing a possible jurisdictional issue, "have no precedential effect" (quotation omitted)); see also Ariz. Christian Sch. Tuition Org., 563 U.S. at 144 ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed.").

Under limited circumstances, a state's express condemnation or endorsement of religion might constitute direct and unwelcome contact. See Awad, 670 F.3d at 1123 (plaintiff's "allegation—that the proposed state amendment expressly condemns his religion and exposes him and other Muslims in Oklahoma to disfavored

19

treatment—suffices to establish the kind of direct injury-in-fact necessary to create Establishment Clause standing"). We need not decide that question in this case. Plaintiffs do not identify any express DCSD policy endorsing religion. See COPE v. Kan. State Bd. of Educ., 821 F.3d 1215, 1221 (10th Cir. 2016) (rejecting reliance on Awad absent express condemnation). Accordingly, we conclude Zoe lacks standing to seek prospective relief.

**B**

Jack Roe argues that he possesses standing to seek retrospective relief because teachers at his son's school endorsed OCC, a religious project. However, he does not claim that his son, who was a junior at DCHS in 2014 when two freshman classes participated in OCC activities, had direct contact with the challenged practices. Instead, he claims that standing is conferred by his son's mere presence at a school in which religious activities are endorsed.

In support of his theory, Roe points to Zorach v. Clauson, 343 U.S. 306 (1952). There, plaintiff parents challenged a program allowing public school children to be released during the day to attend off-site religious instruction. Id. at 308. In a footnote, the Court stated: "No problem of this Court's jurisdiction is posed in this case since, unlike the appellants in Doremus v. Board of Education, 342 U.S. 429 [1952], appellants here are parents of children currently attending schools subject to the released time program." Zorach, 343 U.S. at 309 n.4.

We do not read this sentence as setting forth a rule that a parent has standing to object to any and all conduct occurring at his child's school. Although the

20

particular facts of the case are not patent from the Supreme Court's decision, it is clear that the challenged program operated district-wide. See id. at 308 n.1. And plaintiffs alleged that the program "has resulted and inevitably results in the exercise of pressure and coercion upon parents and children to secure attendance by the children for religious instruction." Id. at 321 (Frankfurter, J., dissenting). It appears likely that the individual plaintiffs' children were personally subjected to the challenged program, and thus the Zorach footnote is consistent with the Court's holding, just a few years later, that parents and schoolchildren have standing if they are "directly affected by the laws and practices against which their complaints are directed." Schempp, 374 U.S. at 224 n.9. The Fourth Circuit has rejected an interpretation of Zorach under which "parents and students currently in school may challenge the constitutionality of school policies without demonstrating that they were personally injured in some way by those policies." Moss v. Spartanburg Cty. Sch. Dist. Seven, 683 F.3d 599, 605 (4th Cir. 2012). We do as well.

Roe also relies on our decisions in Bell and Lanner v. Wimmer, 662 F.2d 1349 (10th Cir. 1981). Although the children in Bell apparently did not attend the religious meetings being challenged in that suit, they were confronted with promotional materials for the meetings, as well as unkind inquiries from classmates as to their lack of attendance. 766 F.2d at 1396-97. And our decision in Lanner, which does not discuss standing other than to note that the defendants did not raise the issue, concerned a release-time program that applied across an entire district. 662 F.2d at 1354-56, 1357 n.8. Neither case suggests that we should depart from our

21

direct and unwelcome contact standard. See Awad, 670 F.3d at 1122. As we held in Roberts, we have found standing in cases that "involved religious activities occurring school wide or within the plaintiffs' own classrooms," such that students "were directly affected." 921 F.2d at 1051. Because Roe has not identified any such contact, we conclude he lacks standing to pursue retrospective relief.[5]

As to his claim for prospective relief, Roe contends that his daughter will be exposed to religious fundraising practices if she enrolls at DCHS as a freshman for the 2017-18 school year, as planned. However, the OCC programs operated in only two classes and only in 2014. We think it at best speculative that Roe's daughter would be subjected to the OCC program. Roe also complains of various FCA activities involving faculty members at DCHS, but he has not shown that his daughter's potential contact with those activities is "certainly impending." Tandy, 380 F.3d at 1283 (quotation omitted).

In light of these various DCHS activities to which he objects, Roe stated that he is "reconsidering whether or not to send [his] daughter to [DCHS]." A parent who

---

[5] Roe briefly states that he asked his children to modify their behavior. This appears to be a reference to his deposition testimony that he instructed his son not to discuss religion at school or participate in religious activities. A change in behavior in response to challenged state action can constitute an injury. See WildEarth Guardians v. Pub. Serv. Co. of Colo., 690 F.3d 1174, 1189 n.10 (10th Cir. 2012). However, Roe does not claim that he so instructed his son as a result of any of the challenged practices. He acknowledged that he was unaware of any specific incidents at DCHS and that he became aware of OCC activities only through this litigation. Accordingly, even assuming that Roe's instructions could be treated as a change in behavior for injury purposes, he has not shown that the injury is "fairly traceable to the challenged action of the defendant." Ariz. Christian Sch. Tuition Org., 563 U.S. at 134 (quotation and alterations omitted).

elects to flee a school in response to Establishment Clause violations would certainly state an injury. See Bell, 766 F.2d at 1399. But Roe's statement that he is considering the option of sending his daughter to a different school is insufficient to show such an injury is "actual or imminent." Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 (1992). His affidavit bears a striking resemblance to the indefinite statements in Lujan itself in which plaintiffs expressed a vague intention to travel "without any description of concrete plans" and which the Court held were wanting. Id. We conclude that Roe lacks standing to pursue prospective relief.

## C

Doe and the other adult plaintiffs argue that they possess municipal taxpayer standing.[6] In Frothingham v. Mellon, 262 U.S. 447 (1923) (decided with Massachusetts v. Mellon), the Court noted that a federal taxpayer's interest in Treasury funds is "shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, [is] . . . remote, fluctuating and uncertain." Id. at 487. Accordingly, subject to limited exceptions, see Flast v. Cohen, 392 U.S. 83 (1968), federal taxpayers lack standing to enjoin federal spending, Frothingham, 262 U.S. at 487. However, relying on "the peculiar relation of the corporate taxpayer to the [municipal] corporation,"

---

[6] The district court dismissed the Doe children's claims as moot after the parties filed a joint motion to dismiss the defendants from the charter school they attend. Although the Doe children were included in the notice of appeal, they do not make any argument as to mootness before this court, nor do they claim to be taxpayers. To the extent they argue that their presence in a school district that allegedly violates the Establishment Clause is sufficient to confer standing, we reject that argument for the reasons stated above.

23

the Frothingham Court stated that "resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation." Id. at 486.

Since Frothingham, the notion of municipal taxpayer standing has been reaffirmed by the Supreme Court, but with little exposition or guidance in its application. In Doremus, the Court considered an Establishment Clause challenge to a state law brought by plaintiffs identified as "citizen[s]" and "taxpayer[s]." 342 U.S. at 430-31. In assessing plaintiffs' standing as taxpayers, the Court recited its prior conclusions in Frothingham that the interests of federal taxpayers are too indeterminable to provide a basis for standing, but that the interests of municipal taxpayers may be sufficiently direct. Id. at 433-34. It then concluded that the holding as to federal taxpayer standing is

> equally true when a state Act is assailed: "The [taxpayer] . . . must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

Id. at 434 (quoting Frothingham, 262 U.S. at 488). The Court determined that a "taxpayer's action can meet this test, but only when it is a good-faith pocketbook action." Id. It concluded that plaintiffs lacked standing because they failed to allege that the challenged "activity is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school." Id. at 433. The Court distinguished a prior taxpayer case, Everson v. Board of Education, 330 U.S. 1 (1947), on the ground that the plaintiff there "showed a

24

measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of." Doremus, 342 U.S. at 434.

The Doremus opinion does not expressly indicate whether its "good-faith pocketbook" requirement was intended to apply to state or municipal taxpayers, or both. Subsequent Supreme Court opinions have characterized Doremus as a state taxpayer case. See Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 600-01 (2007); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 345 (2006). But the Court has said little else about municipal taxpayer standing since Doremus.[7]

Our circuit has not addressed the requirements of municipal taxpayer standing or the application of Doremus thereto. A majority of our sibling circuits to have addressed the issue apply Doremus and hold that municipal taxpayers possess standing only for good-faith pocketbook actions. See ACLU-NJ ex rel. Miller v. Twp. of Wall, 246 F.3d 258, 262-64 (3d Cir. 2001); Doe v. Madison Sch. Dist. No. 321, 177 F.3d 789, 793 (9th Cir. 1999); Clay v. Fort Wayne Cmty. Sch., 76 F.3d 873, 879 (7th Cir. 1996); Thompson v. Cty. of Franklin, 15 F.3d 245, 253 (2d Cir. 1994); D.C. Common Cause v. District of Columbia, 858 F.2d 1, 4 (D.C. Cir. 1988); see also

---

[7] In ASARCO Inc. v. Kadish, 490 U.S. 605 (1989), the rule of Frothingham was described as providing for municipal taxpayer standing "if it has been shown that the 'peculiar relation of the corporate taxpayer to the municipal corporation' makes the taxpayer's interest in the application of municipal revenues 'direct and immediate.'" Id. at 613 (quoting Frothingham, 262 U.S. at 486-87) (alteration omitted). But this portion of the opinion was joined by only four justices, with one justice recused. The Court also briefly discussed municipal taxpayer standing in DaimlerChrysler, but only to conclude that state taxpayers could not "leverage the notion of municipal taxpayer standing beyond challenges to municipal action" by seeking "a remedy as to the state taxes." 547 U.S. at 349, 353.

Koenick v. Felton, 190 F.3d 259, 263 (4th Cir. 1999) (applying Doremus standard in municipal taxpayer case, but not expressly adopting good-faith pocketbook language).

However, in an en banc opinion, the Sixth Circuit questioned the propriety of applying the Doremus good-faith pocketbook standard to municipal taxpayers. See Smith v. Jefferson Cty. Bd. of Sch. Comm'rs, 641 F.3d 197, 211-14 (6th Cir. 2011) (en banc). The court concluded instead that municipal taxpayers need only claim "an alleged misuse of municipal funds." Id. at 210. It rejected the argument that plaintiffs must point to "an action that reduces the municipality's total funds, and thereby increases the risk that taxes will be raised," instead ruling that they may "challenge any unconstitutional appropriation or expenditure, regardless of whether more money would have been spent had the government remained within constitutional bounds." Id. at 211. Complicating the issue further, our sibling circuits that have adopted the good-faith pocketbook requirement have differed somewhat in describing what it means to bring such an action. See ACLU-NJ ex rel. Miller, 246 F.3d at 264 (more than de minimis expenditure); D.C. Common Cause, 858 F.2d at 5 (requiring "a measurable appropriation or loss of revenue"); Madison Sch. Dist. No. 321, 177 F.3d at 794 ("a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of" (quotation omitted)); United States v. City of New York, 972 F.2d 464, 470 (2d Cir. 1992) (stating "we presume a municipal taxpayer's relationship to the municipality is direct and immediate such that the taxpayer suffers concrete injury whenever the challenged

26

activity involves a measurable appropriation or loss of revenue" (quotations omitted)).

For purposes of this case, we need not decide whether to adopt the good-faith pocketbook standard or follow the Sixth Circuit's approach, as plaintiffs cannot establish municipal taxpayer standing under either. Irrespective of the specific language used, every circuit requires a showing of at least some expenditure of municipal funds. "A plaintiff's status as a municipal taxpayer is irrelevant for standing purposes if no tax money is spent on the allegedly unconstitutional activity." Zielke, 845 F.2d at 1470.[8]

Plaintiffs provide a plethora of record citations in support of their argument that DCSD time and materials were used to support Christian fundraising efforts. But none of the cited materials show "a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of." Doremus, 342 U.S. at 434. Instead, the record demonstrates that DCSD faculty used the school email system to create and exchange messages and electronic copies of flyers, allowed fundraising activities to be conducted on school grounds, and allowed student groups to deposit and withdraw funds through a school activities account. But we do not think that mere use of facilities or employees' time demonstrates expenditure of municipal funds. See Madison Sch. Dist. No. 321, 177 F.3d at 794

_____

[8] Because plaintiffs have failed to show evidence of a measurable municipal expenditure, we do not pass on the questions of whether a municipal taxpayer must also show the challenged action resulted in a net diminution of municipal funds, see Smith, 641 F.3d at 210-11, or a "likelihood that resulting savings will inure to the benefit of the taxpayer," City of New York, 972 F.2d at 466.

27

(no taxpayer standing to challenge graduation prayer, and noting that in Doremus "the school's expenditures for teachers' salaries, equipment, building maintenance, and the like were insufficient to confer taxpayer standing despite their indirect support of the Bible reading"); Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 74 (2d Cir. 2001) (rejecting argument that municipal taxpayers have standing any time challenged actions are conducted by paid employees). This is particularly true here because the record suggests much of the complained-of employee time and facility use occurred before or after school hours, and plaintiffs have failed to quantify in any meaningful way the in-school time spent on challenged conduct.[9]

Plaintiffs also note that prizes for certain fundraising activities were paid for through a student government account, donations were made from the proceeds of a school newspaper sale, and a teacher requested a student aid print copies of a thank you letter. But they do not point us to record evidence indicating these activities resulted in expenditures from district tax funds rather than student-raised money. See Lujan, 504 U.S. at 561 (in response to summary judgment motion, plaintiff bears burden of coming forward with "specific facts" to support standing (quotation omitted)). Were it that fundraising in public school facilities or supervision by public school teachers was enough to meet the threshold, Doremus would have necessarily

---

[9] Plaintiffs cite Pelphrey v. Cobb County, 547 F.3d 1263 (11th Cir. 2008), for the proposition that mere use of "municipal funds, in the form of materials and personnel time" is sufficient to confer standing. Id. at 1267. However, defendants in that case did not contest that the county "expended public funds to select, invite, and thank invocational speakers." Id. at 1281.

28

led to a different result. Because plaintiffs have not shown evidence of a specific, measurable municipal expenditure on the challenged conduct, they lack municipal taxpayer standing.[10]

## III

Finally, we consider the district court's ruling that plaintiffs fall outside the "zone of interest" of the EAA. As the Supreme Court explained in Lexmark International, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014), "we presume that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Id. at 1388 (quotation omitted). This test, which is sometimes called "statutory standing" or treated as part of "prudential standing" considerations, does not implicate Article III standing. Id. at 1386-87 & n.4. Instead, the question is whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" under the statute at issue. Id. at 1387. The test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." Id. at 1389 (quotations omitted).

The district court considered the zone of interest test as to each plaintiff. However, as described in Part II, supra, most of the plaintiffs lack Article III

---

[10] Our reasoning as to municipal taxpayer standing differs somewhat from the rationale articulated by the district court, but "we may affirm the judgment on any ground supported by the record." Nakkhumpun v. Taylor, 782 F.3d 1142, 1157 (10th Cir. 2015).

29

standing. Although we focused on Establishment Clause injury in the foregoing analysis, plaintiffs do not identify any other type of injury they have suffered with respect to their EAA claim. Absent some cognizable injury, the Does' and Roe's EAA claims should have been dismissed for lack of Article III standing.

Having concluded that Zoe does have Article III standing, we must consider whether she falls within the EAA's zone of interest. We conclude she does not. The EAA applies to any "public secondary school." 20 U.S.C. § 4071(a). And a "secondary school" is defined as "a public school which provides secondary education as determined by State law." § 4072(1). Under Colorado law, a secondary school is "a public middle, junior, or high school." Colo. Rev. Stat. § 22-91-102(7). Because Zoe's children attend an elementary school, she is plainly outside the class of plaintiffs authorized to sue under the EAA. See Lexmark, 134 S. Ct. at 1387.

## IV

For the foregoing reasons, we **AFFIRM** the district court in all but three respects. We **REVERSE** its dismissal of Zoe's claim for retrospective relief on her Establishment Clause claim and its dismissal of AHA for lack of associational standing. And we **VACATE** its dismissal of the EAA claims asserted by Roe and the Does under the zone of interest test. We **REMAND** with instructions to dismiss Roe's and the Does' EAA claims for lack of Article III standing, and for further proceedings not inconsistent with this opinion.

30